JUDGE COFER
delivered the opinion of the court.
Offutt brought this action in the Jefferson Court of Common Pleas against Bell, alleging that about the 16th of September, 1873, he sold to Bell one thousand fat hogs, to average two hundred and sixty pounds gross, at the price of $4.90 per hundred pounds, to be delivered at the Bourbon House Stock-yard in Louisville, in three lots on different days, between the 1st and 10th of November, to be designated by Bell; that Bell failed to designate the days on which the hogs should be delivered, and that he (Offutt) had on the 7th, 8th, and 10th of November, the 9th being Sunday, tendered one thousand hogs according to the terms of the contract, but that Bell refused to accept them; that he immediately sold them at the place of delivery for the best price he could obtain, which amounted in the aggregate to $3,414.89 less than they would have brought at the contract price, and he prayed for judgment against Bell for that sum.
By an amended petition, filed before Bell had answered, Offutt alleged that after filing his original petition he had learned for the first time that Bell purchased the hogs as the *636 agent of W. B. Hamilton; that both Bell and Hamilton concealed from him the fact that Bell was Hamilton’s agent in the transaction; and making Hamilton a defendant, he prayed judgment against him also.
Bell denied all the .material allegations of the original petition; but admitted that in the month of September, 1873, he was engaged as agent for Hamilton in contracting for hogs; that as Hamilton’s agent he did confer with Offutt concerning the purchase of a lot of about one thousand hogs; that the preliminaries of the contract were discussed, after which he and Offutt separated, agreeing to meet again and reduce to writing any contract they might thereafter make; and that it was well understood that no contract was then made, and that there was to be none except in writing, and he denied that any contract was ever consummated between them; but if thfere was a contract, he alleged that he made it as Hamilton’s agent, having full authority to do so, and that he disclosed his agency at the time to Offutt.
Hamilton answei’ed the petition and amended petition, and put in issue all the facts relied upon as the foundation of a recovery against him.
* A trial was had of the issues thus made, which resulted in a verdict and judgment in favor of Offutt and Hamilton; and Bell’s motion for a new trial as to Offutt, and Offutt’s motion for a new trial as to Hamilton, having been overruled, they have both appealed.
Upon the question whether a contract was in fact concluded, as claimed by Offutt, or only discussed and left incomplete, to be afterward finally agreed upon and reduced to writing, as claimed by Bell, the evidence was conflicting, and it therefore became necessary to submit that question to the decision of the jury.
Upon this point Bell asked the court to instruct the jury that they could not find for the plaintiff unless they believed *637 from the evidence that the alleged contract for the purchase of the hogs was concluded on the night of the 16th of September, 1873, as then understood by both parties; and that if they believed from the evidence that either party understood when they separated that night that any thing else was to be done to consummate the contract, then they must find for the defendant Bell. The court refused so to instruct, and on motion of Offutt told the jury, if they believed from the evidence that Offutt and Bell agreed upon the contract as set forth in the petition, and after the terms had been mutually assented to it was further agreed that they would at a future day reduce said contract to writing, it was not essential to the validity of the contract that it should have been reduced to writing.
The instruction asked by Bell made the question whether a contract had been in fact made depend upon his understanding of the legal effect of the agreement to reduce the terms of the contract to writing, and not upon the question whether they in fact agreed upon the terms, and then agreed to enter into a writing as evidence merely of a contract already made.
The court was. clearly right in holding that if the terms of the, contract had been mutually agreed to, and the parties then made a further agreement to write and sign a paper evidencing those terms, the contract was valid without the writing.
This is not an infringement of the rule that “both parties must purpose and mean the same thing” (Parsons on Contracts, page 5, section 2); or, as otherwise expressed, that there must be “a concurrence of intention in two parties.” (Pothier on Obligations.) The instruction left it to the jury to say whether the parties did purpose and mean the same thing. All the court did was to say in effect, “If these parties agreed the one to sell and the other to buy one thousand hogs of a given quality, to be delivered at a designated place at a given price, *638 on days to be named by the purchaser, there was a valid contract, although they may also have agreed that they would at some future time reduce the terms of their agreement to writing, and although one of the parties may have understood or believed that the contract would not become obligatory on him. until it was written and signed by both parties.”
To hold otherwise would make the validity of contracts depend not on what the parties said and did, but upon their understanding of the legal effect of their words and acts. If two persons enter into a verbal agreement about a matter as to which an enforceable parol contract can be made, it would be no defense when one of them is sued for a breach of the contract that he understood it would not be obligatory unless reduced to writing; nor does a contemporaneous agreement to reduce a contract to writing make its validity depend upon its being actually reduced to writing and signed. The agreement to put it in writing amounts to no more than an agreement by the parties to provide a particular kind of evidence of the terms of their contract, and no more prevents its enforcement upon other legal evidence than an agreement that they would go to a named individual and state to him the terms of their contract would render the testimony of any other competent witness inadmissible to prove what the contract was.
The intention of parties in treaty about a contract must be gathered from their language or their conduct, or both, and the legal effect of what they say and do can not be altered or modified by the undisclosed intention or secret understanding of either.
It appeared from the testimony of Offutt that he did not own quite one half of the hogs tendered to Bell, and that the others belonged to his father, brother, and sister, and perhaps some others, with whom he had agreed that he would take their hogs and put them in on his contract, and pay over to them the price received; and with a view to raise the question *639 whether Offutt had a right to recover for the difference between the contract and the market price of any hogs of which he was not the owner, Bell asked the court to instruct the jury that in the event they should find for Offutt they were not authorized to give damages for so many of the hogs as did not belong to him. But the court refused so to instruct, and told the jury that although Offutt’s father and others may have furnished a part of the hogs tendered, yet he was entitled to recover the entire difference between the contract price and the market price of the whole number of hogs, whether they belonged to him or not.
This action of the court is complained of as erroneous. That Offutt had acquired such interest in the hogs as put him in a position to deliver them to Bell and vest in him a perfect title is not controverted. This was all he was bound by the contract to do; and having been able and ready to perform his agreement, three alternative courses lay open to him: First, he might consider the hogs as his own, and sue for the difference between the contract and market price; or second, he might consider them as Bell’s property, and sell them with due precaution to satisfy his lien for the price, and then sue and recover only for the unpaid balance; or third, he might consider them as the property of Bell, and hold them subject to his call or order, and sue for and recover the whole price which Bell should have paid. (2 Parsons on Contracts, 484; Cook v. Brandeis & Crawford, 3 Met. 557.)
Having the option of the three courses, Offutt made his choice, and Bell is bound by that election. The election made was to treat the hogs as belonging to Bell, and to sell them to satisfy the vendor’s lien for the price, and Bell can not escape the payment of any part of the unpaid balance by showing the manner or terms upon which Offutt obtained them. It was his duty to accept them, and he could not by refusing to do so put himself in a better position than he would have *640 been in if he had complied with his contract. If he had accepted them, he would have acquired a perfect title, and would have been liable to Offutt for the whole price. As he did not accept them, Offutt had a right to treat them as Bell’s property, and to sell them for his account, and after crediting him with the amount realized from the sale to sue for and recover the difference between the amount realized and the contract price; and his right to such recovery rests on the same ground as if Bell had accepted and sold the hogs and paid to Offutt the proceeds of such sale.
Mr. Parsons in his work on Contracts, 284, says the vendor may consider the goods as his own if there has been no delivery, or he may consider them as the vendee’s and sell them with due precaution to satisfy his lien for the price, and sue for and recover only the unpaid balance.
This rule was recognized and acted upon by this court in Cook v. Brandeis & Crawford (3 Met. 557), and is sustained by many authorities cited in the opinion in that case.
This seems to us conclusive of this point. The hogs tendered must for the purposes of this case be regarded as the property of the vendee, and he can no more enter into the inquiry as to where or how or on what terms Offutt procured and held them than if he had in fact accepted them. It does not matter to him that by the terms of the agreement between Offutt and those from whom he obtained the hogs Offutt was to allow them, as a gratuity, the difference between the mai’ket price and the price Beil was to pay. The law fixed the criterion of damages for the breach of the contract, and neither party can resort to any inquiry outside of the single question as to what was in fact the difference between the contract price and the market price at the time and place of delivery. If Offutt had elected to treat the contract-as rescinded and the hogs as his own, the result would have been the same. If the price had suddenly risen after the day of the offer to *641 deliver to double the contract price, or had fallen in a like proportion, the rights and liabilities of- the parties would have been unaffected by it, and for the same reason the amount Offutt has a right to recover can not be influenced by the terms of the agreement on which he procured the hogs.
There was some evidence tending to show that Bell, who is a live-stock broker, was the general agent of Hamilton for the purchase of hogs, and that he purchased Offutt’s hogs as such agent. Hamilton, however, denied that he was his' general agent, and claimed that the only authority he had to buy hogs for him was given in a letter addressed to Bell, and that previous to the making of the contract with Offutt, Bell had purchased for him more hogs than the letter authorized him to buy.
At Hamilton’s instance the court instructed the jury on this point as follows: “If the jury believe from the evidence that Bell received from Hamilton, prior to September 16th, a special authority in writing as follows, viz.:
“ ‘John E. Bell, Louisville, Ky.: I regret that you did not call to see me this morning as promised. I shall be in Chicago for 3 or 4 days, and may be longer. You can buy for me one or two thousand hogs, to average 260 pounds or over, to be delivered, say 300 by the 18th of October, 300 by-the 23d of October, 400 by the 27th, and the balance by the 1st of November—all to be good corn-fatted hogs—at five dollars per hundred, weighing at Louisville. Keep this to yourself.
‘Yours, W. B. Hamilton/
—Then said Bell was constituted thereby a special agent, and was legally required to act in accordance therewith and accordring to the terms and limitations therein contained,, and had no right to violate the same unless afterward authorized by said Hamilton, and before the making of the- alleged contract with plaintiff so to do.”
*642 In view of the evidence tending to prove that Bell was a general agent, it is insisted that this instruction should not have been given.
There seem . to be two grounds upon which it is claimed that he was a general agent. One of these grounds is that he was so by appointment, and his previous employment by Hamilton in the same business, and some declarations made by Hamilton, and the testimony of Bell himself that he had general authority to buy hogs for him, were' relied upon to establish an express agency. The other is that, being a livestock broker, his employment imported a general agency, and that no matter what the extent of the authority actually given was, he was as a matter of law a general agent.
We need not enter into an argument or cite authority to prove that if Bell was a general agent, with express authority, Hamilton is bound by contracts made by him within the scope of the agency, whether Bell disclosed his agency or not, even if he went beyond his private instructions.
But the fact that Bell may have been a live-stock broker did not of itself make1 him a general agent, with unlimited or unrestricted authority to purchase for Hamilton any number of hogs he might choose. The rule that if one who is himself engaged in a particular calling or business be employed to do certain acts for his employer in that trade or business, he will be with respect to his employment a general agent, has no application to the facts of this case. As to the thing to be done, such an. agency may be limited like any other. It is only as to the manner of executing the power given that the agency is general, except in those cases where, from the known course of business or the character or situation of the subject of the agency, a general authority will be conclusively presumed in favor of third persons dealing with the agent. If one sends to an auction-room such goods as are usually sold there, .and directs them to be stored, and the auctioneer sells *643 them in the usual manner, the purchaser will acquire a perfect title; but if one directs a bond broker to buy him ten bonds, the broker can not bind him by a contract to purchase twenty bonds. So in this case, if the letter was the only authority Bell had to buy hogs for Hamilton, the fact that he may have been accustomed to deal in fat hogs did not vest him with authority to bind his principal in contracts for more hogs than he was authorized by the letter to purchase.
But, as we have said, when the agent has in faot general authority his acts are the acts of the principal, and will bind him within the scope of the agency, although the agent may disregard private instructions not communicated to the person with whom he deals; and the court should therefore have qualified the first instruction asked by Hamilton so as to allow the jury to decide on all the evidence whether, notwithstanding the letter, Bell had general authority to buy for Hamilton.
Some of the instructions given recognized the principle that if Bell was a general agent, his principal would be bound by the contract made with Offut; but they did not, in our opinion, cure the error committed in giving the first instruction asked by Hamilton.
It was also sought, to make Hamilton liable upon an alleged ratification. If Bell was a general agent, the contract needed no ratification; and if he was only a special agent, with no authority except the letter quoted in the instruction supra, and had already purchased for his principal two thousand hogs, and did not profess to act as agent in making the purchase, no subsequent assent of Hamilton not made to Offutt can have the effect to bind him as by a ratification. (Chitty on Contracts, 293.) The newly-discovered evidence relied upon by Bell as a ground for a new trial was cumulative merely, and furnished no sufficient reason for setting aside the verdict and judgment. (Allen v. Perry, 6 Bush, 85.)
*644 Perceiving no error to the prejudice of the appellant Bell, the judgment as to him is affirmed; but for the error indicated the judgment as to Hamilton is reversed, and the cause is remanded for a new trial upon principles not inconsistent with this opinion.